FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-05355 (CGM) |
| v. | |
| ABN AMRO BANK (IRELAND), LTD, (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and ABN AMRO CUSTODIAL SERVICES (IRELAND), LTD (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), | |
| Defendants. | |

**MEMORANDUM DECISION DENYING DEFENDANTS' MOTION TO DISMISS**

**A P P E A R A N C E S :**

LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020

*Attorneys for Defendants, ABN AMRO Bank (Ireland) Ltd. and ABN AMRO Custodial Services (Ireland)*
By:    Christopher R. Harris, Esq.
       Thomas J. Giblin, Esq.

BAKER HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*
By:    Regina Grifin, Esq.

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Defendants', ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Ltd.) (n/k/a ABN AMRO Retained Custodial Services (Ireland) Limited) ("ABN/Fortis Fund Bank[1]") and ABN AMRO Custodial Services (Ireland) Limited (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("ABN Custodial/Fortis Fund Services," and together with ABN/Fortis Fund Bank, "Defendants"), motion to dismiss the complaint of Irving Picard, the trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") seeking to recover subsequent transfers allegedly consisting of BLMIS customer property. Defendants assert the affirmative defenses of the "safe harbor," "good faith," and "for value." For the reasons set forth herein, the motion to dismiss is denied in its entirety.

## **Jurisdiction**

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern

---

[1] The Defendants have been defined with different terms in the Complaint and in the motion to dismiss. The Court has combined these terms for ease of the reader.

District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). This Court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated January 31, 2012. In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see* Order, Civ. 08– 01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision. Personal jurisdiction has not been contested by Defendants.

### Background

The Court assumes familiarity with the background of the BLMIS Ponzi scheme operated by Bernard L. Madoff ("Madoff") and its SIPA proceeding. *See Picard v. Citibank, N.A. (In re BLMIS),* 12 F.4th 171, 178–83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard,* 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on December 8, 2010. (Compl., ECF[2] No. 1). The Trustee filed a second amended complaint on June 17, 2022 ("Complaint"). (Am. Compl., ECF No. 205). Defendant, ABN/Fortis Fund Bank was incorporated in 2003, and its principal place of business is in Ireland. (*Id.* ¶ 78). Defendant, ABN Custodial/Fortis Fund Services was incorporated in 1995, and its principal place of business is in Ireland. (*Id.* ¶ 79). "Defendants

---

[2] Citations to this Court's electronic docket refer to the docket of adversary case number 10-05355 unless otherwise noted.

are part of Fortis, a global financial institution whose numerous employees, entities and business groups worked together to provide a menu of banking services to Fortis' clients worldwide." (*Id.* ¶ 80). According to the Complaint, "[i]n 2005, Fortis formally unified all of its onshore and offshore fund service entities, including Defendants." (*Id.* ¶ 83). The transfers at issue in this Complaint, arise out of a swap[3] transaction that ABN/Fortis Fund Bank entered into with Rye Select Broad Market Fund ("Rye XL Fund") on May 2, 2007 ("Swap Transaction"). (*Id.* ¶¶ 18, 193–94).

Nonparty, Rye XL Fund, was formed to provide its investors with returns equal to approximately three times those of the Rye Select Broad Market Fund L.P. ("Rye Broad Market Fund"). (*Id.* ¶ 90). Rye Broad Market Fund invested substantially all of its assets directly, or indirectly, with BLMIS via other Tremont[4]-related BLMIS feeder funds. (*Id.* ¶¶ 89, 244). According to the Swap Transaction, ABN/Fortis Fund Bank agreed to pay Rye XL Fund an amount equal to three times the return on a hypothetical investment in the Rye Select Broad Market Fund in exchange for Rye XL Fund paying it fees and interest and providing it with collateral in the form of cash. (*Id.* ¶¶ 193–94). ABN/Fortis Fund Bank then invested the collateral, plus two times the amount of the collateral, directly into the Rye Broad Market Fund in order to hedge its risk under the Swap Transaction (the "Hedge"). (*Id.* ¶¶ 195, 198).

According to the Complaint, Defendants (via their umbrella organization, Fortis) entered into the Swap Transaction knowing that BLMIS "was not actually trading and/or did not have custody of customer assets." (*Id.* ¶ 189). By entering the Swap Transaction, ABN/Fortis Fund

---

[3] "A swap is a bilateral financial transaction where one counterparty 'swaps' the cash flows of a single asset or basket of assets in exchange for cash flows from the counterparty. As a result, a swap allows the party receiving the total return to gain exposure and the upside returns from a reference fund without actually having to own it." *Picard v. ABN AMBRO (Ireland) Ltd. (In re BLMIS)*, 505 B.R. 135, 139 n.1 (S.D.N.Y. 2013)(quotation omitted).

[4] Nonparty, Tremont Partners, Inc. ("Tremont"), is a Connecticut corporation with its principal place of business in Rye, N.Y. (Am. Compl. ¶ 86). Tremont operated funds that invested all or substantially all of their assets with BLMIS, including Rye XL Fund and Rye Broad Market Fund. (*Id.* ¶ 2). These types of funds that invested heavily in BLMIS are commonly referred to as "feeder funds." (*Id.* ¶ 2).

Bank "earned millions of dollars in fees on the spread of the floating interest rate alone," while believing it could "minimize or shift the risk of any loss." (*Id.* ¶¶ 192, 194).

The Trustee refers to the Defendants interchangeably when stating who received some of the transfers in question. (*See, e.g.*, *id.* ¶¶ 257–67, 340–42) (describing subsequent transfers received by ABN/Fortis Fund Bank "and/or" ABN Custodial/Fortis Fund Services). Both Defendants allegedly played a role in the Swap Transaction and Hedge. (*Id.* ¶ 257–58). ABN/Fortis Fund Bank invested in Rye Broad Market Fund and could redeem shares in same. (*Id.* ¶ 257). ABN Custodial/Fortis Fund Services entered into a subscription agreement with Rye Broad Market Fund on behalf of ABN/Fortis Fund Bank. (*Id.* ¶ 258; *see also, e.g.*, *id.* ("Although Fortis Fund Services was the registered subscriber of the Broad Market Fund partnership interests, the actual owner was Fortis Fund Bank. Further, even though the Broad Market Fund partnership interests were held in the name of Fortis Fund Services, all subscription funds were wired from Fortis Fund Bank's Northern Trust Bank New York account.")).

Via the Complaint, the Trustee is seeking "to recover $265,500,000 in subsequent transfers ('Subsequent Transfers') that Defendants[5] received from [Rye Broad Market Fund] by redeeming shares they owned or partnership interests they held in Broad Market Fund; and from [Rye XL Fund], both of which were operated by [Tremont]." (Am. Compl. ¶ 2). Of the $265,500,000.00, approximately $235,500,000.00 was transferred from Rye XL to ABN/Fortis Fund Bank, between May 2, 2007 and May 1, 2008, as collateral under the Swap Transaction. (*Id.* ¶ 265; *see also* Am. Compl., ex. H). Rye XL allegedly used BLMIS customer property to make these collateral payments to ABN/Fortis Fund Bank. (*Id.* ¶ 264) (stating that the funds Rye XL used to make the additional collateral payments were transferred from BLMIS through Rye

---

[5] The Court refers to the Defendants in this decision for simplicity's sake and is not intending to change the Trustee's use of "and/or" regarding who received the transfers in question.

Broad Market Fund and/or the Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund").

Non-party, Rye Prime Fund is a Delaware limited partnership that held a direct account with

BLMIS.  (*Id.* ¶ 88).  The remaining $30 million sought to be recovered by the Trustee was

redeemed by ABN/Fortis Fund Bank from its Hedge investment in the Rye Broad Market Fund.

(*Id.* ¶ 260).[6]

On August 19, 2022, Defendants filed a motion to dismiss the Trustee's complaint

against them.  In the motion to dismiss, they assert the "safe harbor" and the "good faith and for

value" affirmative defenses.  (*See* Mem. L., ECF No. 208).  The Trustee has opposed the motion.

The Court heard argument on this motion on February 15, 2023.  (2/15/2023 Hrg. Tr., ECF No.

236).

## Discussion

### 12(b)(6) standard

"To survive a motion to dismiss, the complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (cleaned up).  The claim is facially plausible when a plaintiff pleads facts

that allow the Court to draw a "reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,'

but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an

agreement does not impose a probability requirement at the pleading stage; it simply calls for

enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal

agreement.").  In deciding a motion to dismiss, the Court should assume the factual allegations

---

[6] The Complaint contains a useful chart between paragraphs 267 and 268 that illustrates the transfers.  (Am. Compl.
¶¶ 267–68).

are true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] . . . documents incorporated in it by reference[,]" and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

While the Trustee must allege that the initial transfer from BLMIS to the Rye Prime Fund and/or the Rye Broad Market Fund ("Initial Transferees") are avoidable, he is not required to avoid the transfers received by the Initial Transferees before asserting an action against subsequent transferees. *IBT Int'l Inc. v. Northern* (*In re Int'l Admin Servs., Inc.*), 408 F.3d 689, 706–07 (11th Cir. 2005). The Trustee is free to pursue any of the immediate or mediate transferees, and nothing in the statute requires a different result. *Id.*

"[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021).

**Whether *Res Judicata* Prevents Relitigation of § 546(g)?**

The Defendants have raised the "safe harbor" defenses found in § 546(g) and § 546(e) of the Bankruptcy Code.  Section 546 is commonly referred to as the "safe harbor" because it protects certain transfers from being clawed back into the estate by the Trustee.  Section 546(g) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(g).  Section 546(g) protects only an initial transfer and not subsequent transfers. *Picard v. ABN AMBRO (Ireland) Ltd.* (*In re BLMIS*), 505 B.R. 135, 143 (S.D.N.Y. 2013) ("reject[ing] the defendants' assertion that section 546(g)'s safe harbor should be extended to apply to subsequent transfers sought to be recovered by the Trustee under section 550").  Subsequent transferees are entitled to "raise § 546(g) as a defense to the avoidability of the initial transfers that they eventually received even if the initial transferees of those funds failed to raise the defense." *Id.* at 144.

In 2012, the District Court withdrew the reference from this Court "with respect to the issue of whether section 546(g) prevents the Trustee from recovering the relevant transfers" from the Defendants in this case. *Id.* at 137.  The District Court made several holdings in that case, including that the transfers made by BLMIS were made "in connection with" a swap agreement and that the Defendants met the definition of financial participants. *Id.* at 147, 149.  The Court next considered whether the initial transfers were made "by or to (or for the benefit of)" Defendants. *Id.* at 149.  The Court concluded that "only the initial transfers of the redemption

payments, and not the collateral payments, were made 'for the benefit of' the defendants here."[7] *Id.* at 150 ("[S]ection 546(g)'s safe harbor protects the redemption payments, but not the collateral payments, from recovery to the extent they cannot be avoided under section 548(a)(1)(A)."). As such, the $235.5 million in collateral payments made from Rye XL to Defendants remains recoverable by the Trustee. *Id.*

Now, eleven years later, Defendants have again moved for dismissal under § 546(g). (Mem. L. 13, ECF No. 209). This time, they argue that the Court should dismiss the Trustee's cause of action seeking to collect the collateral payments under § 546(g) because the collateral payments were made "for the benefit of" Rye Prime Fund and the District Court never considered whether Rye Prime Fund is a "financial participant" for purposes of § 546(g). (*Id.* at 14). The Trustee argues that Defendants are precluded from relitigating this issue. (Opp'n. 8, ECF No. 214). The Court agrees.

Defendants previously moved to dismiss this case based on the safe harbor found in § 546(g). *Picard v. ABN AMBRO (Ireland) Ltd.* (*In re BLMIS*), 505 B.R. 135 (S.D.N.Y. 2013). "The law of the case doctrine forecloses reconsideration of issues that were decided—or that could have been decided—during prior proceedings in the same case." *United States v. Vale*, 596 F. App'x 34, 34 (2d Cir. 2015). "[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v.*

---

[7] The $30 million redemption that the Trustee seeks to recover, though technically covered by § 546(g), remains a viable cause of action under this Complaint. *ABN AMBRO (Ireland)*, 505 B.R. at 149 ("In order to fulfill AA Ireland's redemption request, Broad Market withdrew $30 million from its Madoff Securities account, and subsequently transferred the $30 million of Madoff Securities Customer Property to AA Ireland. Since the funds' withdrawals were directly caused by the defendants' request for redemptions, these initial transfers were 'for the benefit' of defendants as redeeming investors, who benefited by maintaining their perfect hedge on the swap transactions."). This is because the Trustee remains free to avoid the initial transfer, between BLMIS and Rye Broad Market Fund, under § 548(a)(1)(A). The $30 million redemption, as well as the preceding initial transfers, occurred within two years of the SIPA filing date, and therefore, remains potentially recoverable. During the two years prior to the SIPA filing date, BLMIS transferred $60 million to the Rye Broad Market Fund. (Am. Compl. Ex. G (indicating that the subsequent transfer from Rye Broad Market Fund to ABN/Fortis Fund Bank occurred on July 1, 2008); *see also* Am. Compl. ¶ 245 ("During the two years prior to the SIPA filing date, BLMIS transferred $60 million to the Broad Market Fund.")).

*Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (citing *Arizona v. California*, 460 U.S. 605, 618

(1983)).  Defendants are foreclosed from litigating this issue again at this stage of the litigation.

Even if this argument were not foreclosed, it would still fail because the Complaint does

not show on its face that the initial transfers fall within the 546(g) safe harbor.  The Complaint's

only relevant mention of Rye Prime Fund states: "[b]etween July 3, 2007 and November 24,

2008, [Rye] Prime Fund transferred $292,472,765 of Customer Property to Rye XL Fund as

investments in the form of subscription payments."  There is no indication of what benefit Rye

Prime Fund supposedly received.  Likewise, there is no particular allegation regarding the Swap

Transaction at issue in this case in the Tremont Complaint, which has been adopted by reference

herein.

"An affirmative defense may be raised by a pre-answer motion to dismiss under Rule

12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of

the complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).  "Not

only must the facts supporting the defense appear on the face of the complaint, but, as with all

Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief."

*McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (cleaned up).  A "plaintiff is entitled to all

reasonable inferences from the facts alleged, not only those that support his claim, but also those

that defeat the [affirmative] defense." *Id.*  Without additional facts, the Court cannot say that the

Trustee can prove "no set of facts in support of his claim." *Id.*

Defendants may choose to assert the § 546(g) defense in their answer as it is their burden

to plead and prove an affirmative defense that does not appear on the face of the Complaint.

*Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021).

**Section 546(e) does not bar the avoidance of the Initial Transfers to the Rye Prime Fund and/or the Rye Broad Market Fund**

Section 546(e) protects a transfer that is a "settlement payment ... made by or to (or for the benefit of) a ... financial institution [or] financial participant," or that is "made by or to (or for the benefit of) a ... financial institution [or] financial participant ... in connection with a securities contract." 11 U.S.C. § 546(e). By its terms, the safe harbor is a defense to the avoidance of the initial transfers. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018). Subsequent transferees are also entitled to raise a § 546(e) defense against Trustee's recovery of the initial transfer funds. *Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021). To the extent that the safe harbor bars the Trustee from collecting the initial transfer, he would also be barred from collecting any subsequent transfers.

In *Fishman*, the Court of Appeals for the Second Circuit determined that, in many of the Trustee's avoidance actions, § 546(e) applied because BLMIS' transfers to its customers qualified as payments made "in connection with" securities contracts between BLMIS and its customers. *See Picard v. Ida Fishman Recoverable Trust* (*In re BLMIS*), 773 F.3d 411, 422 (2d Cir. 2014). However, the safe harbor does not apply, by its plain terms, to transfers where the transferee is complicit in BLMIS' fraud. *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022). This is because "any transferee who knew the transfers it received from Madoff Securities contained only stolen proceeds also knew those transfers were neither settlement payments [n]or transfers in connection with a security agreement" and therefore, § 546(e) cannot apply.[8] *Id.*

---

[8] While this is sometimes referred to as the "knowledge exception" to the safe harbor, "*Cohmad* did not carve out any atextual but equitable exception to an otherwise applicable Section 546(e) defense; rather, it simply concluded that, in circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) did not apply

> The safe harbor was intended, among other things, to promote the reasonable expectations of legitimate investors. If an investor knew that BLMIS was not actually trading securities, he had no reasonable expectation that he was signing a contract with BLMIS for the purpose of trading securities for his account. In that event, the Trustee can avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted under state and federal law.

*Picard v. Legacy Cap. Ltd.* (*In re BLMIS*), 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016) (internal citations omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171 (2d Cir. 2021)). By holding that the affirmative defense provided by § 546(e) is not applicable in situations such as the one alleged here, "sham" securities contracts do not prevent the Trustee from clawing back complicit parties' ill-gotten gains. The district court has already determined that "those defendants who claim the protections of Section 546(e) through a Madoff Securities account agreement but who actually knew that Madoff Securities was a Ponzi scheme are not entitled to the protections of the Section 546(e) safe harbor, and their motions to dismiss the Trustee's claims on this ground must be denied." *See Secs. Inv. Prot. Corp. v. BLMIS* ("*Cohmad*"), No. 12 MC 115(JSR), 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013); *see also Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022) ("[I]n circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) d[oes] not apply as a matter of its express terms.").

This Court is powerless to reconsider this issue, agrees with the district court's reasoning, and finds the district court's holding consistent with *dicta* set forth by the Court of Appeals for the Second Circuit. *See Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 420 (2d Cir. 2014) ("The clawback defendants, having every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions, have every right to avail

---

as a matter of its express terms." *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

themselves of all the protections afforded to the clients of stockbrokers, including the protection

offered by § 546(e).").

Whether the safe harbor applies to the initial transfers under the theory that BLMIS'

transfers to the initial transferees were made in connection with different contracts (rather than

the contracts with BLMIS) is not answerable on the pleadings.  If such a fact-specific

determination is needed, the Court will make it with the benefit of a "full factual record."  *Picard*

*v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *9

(S.D.N.Y. Nov. 3, 2022).

### The Trustee Has Pled that the Initial Transferees' Actual Knowledge that BLMIS was Not Trading Securities

Here the Trustee has pleaded sufficient allegations of the Initial Transferees actual

knowledge that no securities were being traded.  (Am. Compl. ¶¶ 268–337).  The Initial

Transferees were funds operated by Tremont.  (*Id.* ¶ 2).  The Initial Transferees are not natural

persons and, as such, act only through "the instrumentality of their officers or other duly

authorized agents."  *45 John Lofts, LLC v. Meridian Capital Grp., LLC* (*In re 45 John Lofts,

LLC*), 599 B.R. 730, 743 (Bankr. S.D.N.Y. 2019).  An agent's knowledge and acts are imputed

to a corporate defendant.  *Id.*; (Am. Compl. ¶ 315–23) (alleging imputation of knowledge).  The

Trustee has dedicated sixteen pages to Tremont's actual knowledge that BLMIS was not trading

securities. (*Id.* ¶¶ 268–337).  He has also adopted by reference the complaint against Tremont in

adversary proceeding 10-05310.  (*Id.* ¶ 268; *see also Picard v. Tremont Grp. Holdings, Inc.* (*In

re BLMIS*), Adv. Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010)).

At oral argument, Defendants asked this Court to consider the Initial Transferees'

scienter under *Elendow*.  *Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund* (*In re Tremont

Sec. L., State L., and Ins. Litig.*), No. 10 Civ. 9061(TPG), 2013 WL 5179064, at *5 (S.D.N.Y.

Sept. 16, 2013), *aff'd*, 588 F. App'x 27 (2d Cir. 2014); (2/15/2023 Hrg. Tr. 19:13–20:8.
*Elendow*'s standard is not the standard this Court was directed to consider by the District Court
in *Cohmad*.  The District Court explicitly directed this Court to consider whether the initial
transferees "actually knew" that BLMIS was a Ponzi scheme.  *Cohmad*, No. 12 MC 115 JSR,
2013 WL 1609154, at \*10 (S.D.N.Y. Apr. 15, 2013).  That being said, the Trustee's Complaint
easily falls within the *Elendow* standard, which requires a plaintiff to "plead facts giving rise to
an inference of fraudulent intent that is cogent and at least as compelling as any opposing
inference of nonfraudulent intent."  *Elendow*, 2013 WL 5179064, at \*4.   To show scienter
under *Elendow*, the plaintiff must show "an extreme departure from the standards of ordinary
care . . . to the extent that the danger was either known to the defendant or so obvious that the
defendant must have been aware of it."  *Id.* at \*5.  The Court in *Elendow* was analyzing a
completely different complaint.[9]  Based on the allegations in this Complaint, it would be
implausible for Tremont not to have been aware of the Ponzi scheme.

   Among other things, the Trustee has alleged that: Tremont's senior executives had a close
relationship with Madoff (*id.* ¶ 270); Tremont received repeated, direct warnings about Madoff
(*id.* ¶ 273); Tremont excluded Madoff from its due diligence practices (*id.* ¶ 294); Tremont
shielded Madoff from third parties (*id.* ¶ 307); and that Tremont's own reporting showed that
BLMIS' trades were impossible (*id.* ¶ 286).   For example, monthly analytics prepared by
Tremont's senior management showed that BLMIS' positions and prices differed from reported
prices.  (*Id.* ¶ 289).  And Tremont knew BLMIS could not be trading real securities because it
"knew BLMIS had well in excess of $20 billion in AUM by May 2003, and [because] it
monitored all trade activity, Tremont must have seen dozens, if not hundreds, of trades in which

---

[9] The Complaint in *Elendow* was filed by the Elendow Fund, LLC (and not the Trustee), on December 13, 2010.
*See Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund, L.P.*, No. 1:10-cv-09061-TPG, ECF No. 1.  The
Complaint this Court is analyzing was last amended in 2022.

there was insufficient volume for Madoff to complete the transactions." (*Id.* ¶ 290). The Trustee

has also alleged that "[i]n response to evidence on the face of BLMIS's trade tickets that the

options were suspect, Tremont sought to hide the issues and evidence from investors through

deflection and fabrication." (*Id.* ¶ 312). Tremont also knew that BLMIS had no International

Swaps and Derivatives Association agreements in place for its purported OTC options trades, a

basic requirement for OTC option trades, and that Madoff's trade confirmations did not identify

counterparty information that should be on all OTC trade confirmations. (*Id.* ¶ 313). All of this

was overlooked because Tremont, admittedly, made a lot of money on management fees for

doing nothing other than allowing investors access to BLMIS. (*Id.* ¶ 332).

      Here, the Trustee has sufficiently pleaded the Initial Transferees had actual knowledge

that BLMIS was not trading securities, which makes the safe harbor inapplicable by its express

terms. *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL

16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

      The safe harbor is not applicable to subsequent transfers. "By its terms, the safe harbor is

a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re BLMIS)*,

594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original); *see also* 11 U.S.C. § 546(e)

(failing to include § 550 in its protections). Since there must be an initial transfer in order for the

Trustee to collect against a subsequent transferee, a subsequent transferee may raise the safe

harbor as a defense—but only in so far as the avoidance of the initial transfer is concerned. The

safe harbor cannot be used as a defense by the subsequent transferee because the Trustee is not

"avoiding" a subsequent transfer, "he recovers the value of the avoided initial transfer from the

subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the

recovery claims under section 550." *BNP Paribas S.A.*, 594 B.R. at 197.

**Whether all of the Initial Transfers Had to Occur Within the Two-Year Statutory Period under § 548(a)(1)(A)?**

Having found that the safe harbors do not apply in this case, the Trustee is not limited to collecting only those transfers that occurred withing the two-year statutory period.

At this stage of the litigation, the Trustee need only "allege facts that support the inference that the funds at issue originated with the debtor." *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014). The Trustee is not required to plead "a dollar-for-dollar accounting of the exact funds at issue." *Id.* at 150. The Trustee has alleged that Rye Broad Market Fund and Rye Prime Fund invested substantially all of their assets with BLMIS. (Am. Compl. ¶¶ 244, 247). BLMIS allegedly transferred $252 million to Rye Broad Market Fund and $945 million to the Rye Prime Fund within six years of the SIPA filing date. (*Id.* ¶¶ 245, 248). Of those funds, Rye Broad Market Fund transferred at least $48,387,616 to Rye XL Fund. (*Id.* ¶ 252). And Rye Prime Fund transferred at least $292,472,765 of those funds to Rye XL Fund. (*Id.* ¶ 255). The Trustee has also alleged that ABN/Fortis Fund Bank received $30 million from the Rye Broad Market Fund and $235,500,000 from Rye XL Fund. (Am. Compl. ¶¶ 260, 265). The alleged initial transfers more than cover the subsequent transfers sought to be collected by the Trustee in this case and adequately apprise the Defendants of the "who, when, and how much" of each transfer. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018).

 In order to ultimately determine how the initial and subsequent transferees spent the millions of dollars they received from BLMIS, this Court would need to review financial documents in order to trace the BLMIS monies to all of the initial transferees' principals, insiders, creditors, and customers. Undoubtedly, the Court will do this tracing and calculation at

a later stage of litigation.  At this stage, the Trustee need only assert plausible allegations that

Defendants received BLMIS monies.

Taking all allegations as true and reading them in a light most favorable to the Trustee,

the Complaint plausibly pleads that Defendants received customer property.

### Whether BLMIS's Initial Transfers Are Avoidable as Intentionally Fraudulent Conveyances?

In relevant part, § 548(a)(1)(A) allows the Trustee to avoid any transfer made within two

years before the filing date of this SIPA action, if BLMIS made the transfer with "actual intent to

hinder, delay, or defraud."  11 U.S.C. § 548(a)(1)(A).  The Defendants argue that BLMIS' initial

transfers, made within two years of the SIPA filing date, are not avoidable because the Trustee

has failed to plead BLMIS' actual fraudulent intent with respect to each transfer and that the

Ponzi scheme presumption cannot be used to plead BLMIS' actual fraudulent intent.

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt a more liberal view since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of personal knowledge is compounded with complicated issues and transactions that extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned

up).

Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's

burden of pleading actual fraudulent intent is satisfied.  (Am. Compl. ¶¶ 47–77); (*id.* ¶ 40) (

Madoff pleaded guilty to operating a Ponzi scheme through BLMIS).  The "Ponzi scheme

presumption" allows courts to presume actual intent to defraud on part of the operator of the Ponzi scheme. *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud."). In this case, the Ponzi scheme presumption allows the Court to presume that BLMIS made the initial transfers with actual intent to defraud because Madoff has admitted to operating a Ponzi scheme.

The mere existence of a Ponzi scheme "demonstrates actual intent as matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Bear, Stearns Secs. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 8 (S.D.N.Y. 2007). The "Ponzi scheme presumption" makes perfect sense in cases such as this one. BLMIS had no legitimate assets and therefore every transfer made by BLMIS was made with actual intent to defraud in order to ensure that Ponzi scheme would survive.

The Trustee has pleaded that BLMIS operated a Ponzi scheme and as such, BLMIS' actual fraudulent intent is presumed via the Ponzi scheme presumption. (Am. Compl. ¶¶ 47–77). Intent to defraud is established as debtor operated a Ponzi scheme. *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing *Secs. Inv. Prot. Corp. v. BLMIS ("Omnibus Good Faith Decision")*, 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015)) ("[T]he Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption'"). That BLMIS operated as a Ponzi scheme is well-established and the Court relies on earlier findings of same and holds that the Trustee has met its burden of pleading

BLMIS' actual intent on this issue. *See Picard v. Legacy Cap. Ltd.*, 603 B.R. 682, 688–93

(Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS was a Ponzi scheme and why the

Trustee is permitted to rely on the Ponzi scheme presumption to prove intent as a matter of

law); *see also Bear, Stearns Secs. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1,

11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit.").

The Ponzi scheme presumption saves the Trustee and the courts time and resources by

presuming that each transfer was made with actual fraudulent intent. Without the presumption,

Defendants would not be "off-the-hook" for the two-year transfers because the Trustee would

meet (and, in this case, has met) his pleading burden by pleading the "badges of fraud" with

respect to BLMIS.

> Badges of fraud include (1) the lack or inadequacy of consideration; (2) the
> family, friendship or close associate relationship between the parties; (3) the
> retention of possession, benefit or use of the property in question; (4) the financial
> condition of the party sought to be charged both before and after the transaction in
> question; (5) the existence or cumulative effect of a pattern or series of
> transactions or course of conduct after the incurring of debt, onset of financial
> difficulties, or pendency or threat of suits by creditors; (6) the general chronology
> of the event and transactions under inquiry.

*See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983). The "concealment

of facts and false pretenses by the transferor" is also a circumstance from which courts have

inferred intent to defraud. *Id.* at 1582 (quoting 4 *Collier on Bankruptcy* ¶ 548.02[5] at 548–34 to

38 (L. King 15th ed. 1983)). The existence of several badges can "constitute conclusive evidence

of an actual intent to defraud." *Kirschner v. Fitzsimons* (*In re Tribune Co. Fraudulent

Conveyance Litig.*), No. 11-md-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017)

(citation omitted); *Picard v. Nelson* (*In re BLMIS*), 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019).

BLMIS' actual fraudulent intent is well-pleaded in the Complaint. (Am. Compl. ¶¶ 47–

77). The Court need not infer intent to defraud because Madoff has admitted that he had actual

intent to defraud when he admitted under oath that he operated a Ponzi scheme.  (*Id.* ¶ 40).  In addition to this, the Trustee has alleged that "BLMIS's website omitted the I[nvestment] A[dvisory] Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register."  (*Id.* ¶ 50). For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its I[nvestment] A[dvisory] Business.  (*Id.* ¶ 51).  BLMIS lied to the SEC in reports regarding the number of accounts it has and "grossly understated" the amount of assets under management.  (*Id.* ¶ 52).  BLMIS had no legitimate business operations and produced no profits or earnings.  (*Id.* ¶ 53).  "Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud."  (*Id.* ¶ 53).  BLMIS used its fraudulent investment advisory business to prop up its proprietary trading business.  (*Id.* ¶ 59).  "BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments."  (*Id.* ¶ 60).  "There are no records to substantiate Madoff's sale of call and put options in any amount, much less in billions of dollars."  (*Id.* ¶ 65). "Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. Not only did BLMIS regularly show gains when the S&P 100 Index was down (at times significantly), it would also post gains that exceeded (at times, significantly) the S&P 100 Index's performance. Such results were impossible if BLMIS had actually been implementing the SSC strategy."  (*Id.* ¶ 67).  "There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing

Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities." (*Id.* ¶ 73). Though unnecessary, the Trustee has sufficiently pleaded the badges of fraud.

The Trustee has successfully pleaded badges 2, 3, 4, 5, and 6. The Trustee need not plead all six badges of fraud to meet his burden of pleading actual fraudulent intent. *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980) ("Such indicators or badges, when established either singularly, but more often in combination, may justify the inference of the requisite intent to hinder, delay or defraud creditors.").

## Other Affirmative Defenses

"An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (cleaned up). A "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the [affirmative] defense." *Id.*

### i.   *Good Faith*

The Complaint does not support Defendant's affirmative defense of good faith on its face. Defendants not natural persons and, as such, act only through "the instrumentality of their officers or other duly authorized agents." *45 John Lofts, LLC v. Meridian Capital Grp., LLC* (*In re 45 John Lofts, LLC*), 599 B.R. 730, 743 (Bankr. S.D.N.Y. 2019). An agent's knowledge and

acts are imputed to a corporate defendant. *Id.*; (Am. Compl. ¶ 315–23) (alleging imputation of

knowledge). Defendants are alleged to be part of Fortis. (Am. Compl. ¶ 80). The Trustee has

dedicated forty-two pages to Defendants' knowledge of BLMIS' fraud, its lack of good faith, and

its willful blindness to red flags. (*Id.* ¶¶ 91–242). The Trustee has alleged that by 2003 Fortis

had identified many indices of fraud at BLMIS. (*Id.* ¶ 15). One glaring allegation is that "Fortis

decided to enter into the Swap Transaction and to hedge its obligations by investing in Broad

Market Fund – but not before first obtaining certain special rights and built-in protections

that would minimize Defendants' losses if BLMIS were in fact engaging in fraud." (*Id.* ¶ 180).

Having determined that "good faith" cannot be found on the face of a complaint, the Court must

deny Defendant's motion on this argument.

Defendants argue that the bankruptcy court has already considered the issue of their good

faith in *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re BLMIS)*, No. 08-01789 (SMB) SIPA

Liquidation, Adv. Pro. No. 10-05355 (SMB), 2020 WL 401822, at *6 (Bank. S.D.N.Y. Jan. 23,

2020). The court made no determination regarding Defendants good faith in the January 23,

2020 decision. In that case, the court determined only whether the Trustee plead facts sufficient

to survive a Rule 12(b)(6) motion. *Id.* At the time the court issued that decision, the burden of

pleading good faith rested with the Trustee. That pleading burden has since been reversed.

*Picard v. Citibank, N.A. (In re BLMIS)* ("*Citibank*"), 12 F.4th 171, 200 (2d Cir. 2021), *cert.*

*denied* No. 21-1059 (Feb. 28, 2022) ("Nothing in SIPA compels departure from the well-

established rule that the defendant bears the burden of pleading an affirmative defense.

Accordingly, the district court erred by holding that the trustee bears the burden of pleading a

lack of good faith under Sections 548(c) and 550(b)(1)."). And the decision upon which

Defendants rely has likewise been vacated. *In re BLMIS*, No 20-cv-02586(CM), 2022 WL

1304589, at *4 (S.D.N.Y. May 2, 2022) ("Judge Bernstein's decision was based on a now-overruled standard of law, remand is appropriate to permit the record to be developed, and the lower court to make findings, in accordance with the *Citibank* decision.").

In the May 2, 2002 decision, the District Court explained that good faith is a fact-intensive inquiry that almost always requires a trial: "The Second Circuit made clear in its decision in *Citibank* that the inquiry notice standard requires a 'fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees.'" *In re BLMIS*, No 20-cv-02586(CM), 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022). And that "such a fact-based determination can only be made based on the entirety of the factual record after discovery . . . ." *Id.* (internal quotation omitted).

The burden of proving good faith falls squarely on Defendants and this Court cannot make a determination on Defendants' affirmative defense until after a fact-intensive inquiry. Discovery is required on this issue.

Even so, the Complaint contains allegations that Defendants knew about BLMIS' fraud. (Am. Compl. ¶¶ 130–242). The Trustee has dedicated over 32 pages in his Complaint to Defendant's knowledge or willful blindness to BLMIS' fraud. (*Id.*). Fortis, the umbrella organization that allegedly includes Defendants, was allegedly "nervous" about BLMIS prior to entering the Swap Transaction. (*Id.* ¶ 142). A non-party Fortis entity redeemed $56 million it has invested with Rye Broad Market Fund (its entire investment) over its concerns about Madoff. (*Id.* ¶ 163). "In the course of conducting due diligence on the proposed Swap Transaction, Fortis employees became directly aware of still further compounding facts which heightened the risk of fraud at BLMIS. Specifically, Fortis employees reported information about the mechanics of

Madoff's options trades that was contradicted not only by what BLMIS employees had directly informed Fortis years earlier, but also by what Tremont itself was contemporaneously telling Fortis." (Am. Compl. ¶ 169). As to Defendants' purported knowledge that BLMIS was not trading securities over an exchange, the Trustee states: "Fortis employees were now aware that a critical piece of information about a party they suspected of fraud was shifting and contradictory to what Fortis had been informed of previously. Rather than inquiring about the inconsistencies and verifying where the options trades took place, Fortis chose to blind itself to all of the facts suggesting a high probability of fraud at BLMIS. Fortis decided to enter into the Swap Transaction and to hedge its obligations by investing in Rye Broad Market Fund – but not before first obtaining certain special rights and built-in protections that would minimize Defendants' losses if BLMIS were in fact engaging in fraud as discussed in more detail below." (Am. Compl. ¶ 80).

"When Fortis entered into the Swap Transaction, it did so knowing that its employees had previously expressed their concern that Madoff was not actually trading and/or did not have custody of customer assets, and further, that Fortis had a duty to confirm these facts, but ultimately Fortis deliberately chose not to do so. That pre-existing willful blindness was now compounded by Fortis' decision to enter into the Swap Transaction while ignoring the fact that that it also now was aware that previous representations made by both BLMIS and Tremont about a material part of BLMIS's investment trading strategy were being contradicted. This contradiction is a further exhibition of willful blindness regarding the possibility of fraud at BLMIS." (Am. Compl. ¶ 189).

To state the obvious, Defendants "good faith" is not pled on the face of the Complaint.

### ii. *Knowledge of the Voidability*

Good faith is linked with whether one had knowledge of the voidability of the transfer. *Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 189 (2d Cir. 2021) ("[A] transferee does not act in good faith when he has sufficient actual knowledge to place him on inquiry notice of the debtor's possible insolvency."), *cert. denied sub nom. Citibank, N.A. v. Picard*, 212 L. Ed. 2d 217, 142 S. Ct. 1209 (2022).  Having determined that "good faith" cannot be found on the face of a complaint, the Court must deny the Defendant's motion on this element.  Additionally, § 550(b)(1) provides a defense to recovery making lack of knowledge Defendants' burden to plead and prove.  It is a fact-intensive inquiry that requires a three-step inquiry into 1) what the Defendants subjectively knew; "whether these facts put [Defendants] on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the [Defendants'] position to conduct further inquiry into a debtor-transferor's possible fraud; and whether "diligent inquiry by [Defendants] would have discovered the fraudulent purpose of the transfer." *Picard v. Citibank*, 12 F.4th at 192.

Defendants argue that the fact that they performed due diligence is enough to satisfy this prong at a 12(b)(6) stage of litigation.  (Mem. L. 33, ECF No. 209).  The fact that Defendants performed due diligence does not make it any more likely that they lacked knowledge than that they had knowledge of the fraud at BLMIS.  Indeed the Trustee's Complaint alleges that the Defendants' due diligence uncovered BLMIS' fraud.  Defendants allegedly choose to invest despite the high probability of fraud (or possible because of the high likelihood of fraud) due to Fortis' own financial struggles, in order to bolster Fortis' appearance of profitability.  (Am. Compl. ¶¶ 220–23).  The Trustee has pleaded that Fortis had "powerful motivation" "to deliberately avoid examining facts suggesting fraud at BLMIS, in order to enter into the Swap

Transaction that would generate what was apparently desperately needed revenue in the short term." (Am. Compl. ¶ 223).

Though it is not his burden to plead, the Trustee's Complaint is far from lacking in allegation of Defendants' knowledge of BLMIS' fraud.  Defendants must plead and prove their lack of knowledge at a later stage of litigation.

## <u>Conclusion</u>

For the foregoing reasons, the Defendants' motion to dismiss is denied.  The Trustee shall submit a proposed order within fourteen days of the issuance of this decision, directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-1(a).



**/s/ Cecelia G. Morris**

**Dated: March 28, 2023**
**Poughkeepsie, New York**

    **Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**